LEWIS M. PETTIS, Respondent, v. NEW YORK STATE ELECTRIC AND GAS CORPORATION, Appellant.

Third Department, January 21, 1937.

*Chernin & Gold* [*James B. Gitlitz* and *A. E. Gold* of counsel], for the appellant.

*Tillapaugh & Relihan* [*Walter J. Relihan* and *Daniel J. McAvoy* of counsel], for the respondent.

BLISS, J. Appeal by defendant from a judgment in favor of plaintiff against the defendant for $10,462.64 damages and costs, entered in the Broome county clerk's office on August 14, 1936, upon a jury's verdict rendered at the Broome Trial Term of the Supreme Court and from an order denying defendant's motions for a dismissal of the complaint and direction of a verdict and from an order denying defendant's motion to set aside the verdict and for a new trial.

Edwin T. Wolford was the owner of a club diner in which had been installed a Frigidaire electric refrigerator. The principal parts of this refrigerating system were an evaporator in a box in the diner in which the food was placed and a compressor downstairs. Pipes

containing sulphur dioxide, which was used as the refrigerant, connected the compressor and evaporator. Sulphur dioxide is a liquid which will boil at fourteen degrees Fahrenheit and will, if exposed to heat while confined, create pressure. It is a common refrigerant; gas masks and goggles are ordinarily specified to be used in handling it on account of its injurious properties, and in shipping this volatile liquid it is required to be properly crated and labeled according to the Bureau of Explosives of the United States Department of Commerce.

In August, 1934, Wolford decided to remove this electric refrigeration system and told a representative of the defendant that he intended to install an ice refrigeration plant, asked him to put in a work order to have the old box dismantled or the unit taken out and said that he was junking the old equipment entirely. The representative entered the work order with the defendant and two of the defendant's employees came to the diner and disconnected the system. In so doing they did not draw off all of the refrigerant from the cylinder of the evaporator but left some refrigerant confined therein. Defendant's workmen gave Wolford no warning of having left the refrigerant in the cylinder or of its dangerous propensities. The cylinder was then removed to the rear of the diner and remained there for several days. Wolford gave it to the plaintiff to junk it or sell it for junk. At that time Wolford had no knowledge of the explosive qualities of sulphur dioxide but he did know that some sort of a liquid was inside of the cylinder. He did not tell the plaintiff about this liquid. After the plaintiff had kept the evaporator for several days, during the month of August he decided to tear it apart and removed six studs holding the cap on the cover of the cylinder. The cover stuck and plaintiff tapped the edge of the cover with a wrench. The cover suddenly flew off with an explosion and the head struck the plaintiff in the face. The refrigerant flew into his eyes and he sustained the injuries for which he has recovered this verdict. The sulphur dioxide had created a pressure within the cylinder from being exposed to the summer heat. The pressure caused by the confined liquid was shown to be the producing cause of the explosion. Experts testified that the usual and proper method of disconnecting a system such as this was to draw out all of the refrigerant from the evaporator and that the evaporator should be drained completely dry of any refrigerant because of the dangerous nature of the confined refrigerant.

The court submitted to the jury the question whether the defendant used reasonable care in leaving the sulphur dioxide confined in the evaporator after disconnecting it, whether it should have reasonably foreseen that someone might be injured by the release

of the gas pressure and whether it should have given warning concerning it. There were no exceptions to the charge. In a memorandum handed down upon the denial of the motion to set aside the verdict and for a new trial the trial court stated that it had submitted the case under the rule laid down in *Parnell* v. *Holland Furnace Co.* (234 App. Div. 567; affd., 260 N. Y. 604).

While the instant case does not come within a proper application of the principles discussed in the *Parnell* case, in that neither children nor an attractive nuisance are involved, it does fall well within the compass of the established rules of negligence applied to one who negligently repairs a chattel. (See Restatement of the Law of Torts, vol. 2, chap. 14, § 404.) And the charge of the trial court, with which no fault was found by the appellant, must now be held to be the law of the case.

The jury was fully justified in finding that the defendant was negligent and that such negligence was a proximate cause of the plaintiff's injuries. The defendant had failed to follow the usual method of disconnecting this kind of an electric refrigerator. When it left the sulphur dioxide confined in the cylinder of the evaporator it created a situation which was inherently dangerous to all who came within range of its force, except such as had knowledge thereof. A new and highly potential risk had been produced. The plaintiff was included within the ambit of liability as the defendant had actual notice that the evaporator was to be disposed of by Wolford and that he intended to junk it.

The judgment and order should be affirmed, with costs.

HILL, P. J., and CRAPSER, J., concur; HEFFERNAN, J., concurs in the result; McNAMEE, J., dissents, with an opinion.

McNAMEE, J. (dissenting). Edwin T. Wolford conducted a restaurant in what is known as a " club diner " in Johnson City. As a part of his equipment he operated and maintained for eight and one-half years a cooling system known as a Frigidaire. He became dissatisfied with it, and decided to replace it with an ice box. Grover Albee was a salesman of the defendant, and a friend and customer of Wolford, and they had done " quite a bit " of favors for each other. Wolford told the salesman of the difficulties he had had with the Frigidaire, that he was going to " junk " it, that it broke down " constantly," that it burned out five or six motors, that his experience with it was " terrible," and he " wondered " if the salesman would not put in a " work order " with his employer, the defendant, to have the Frigidaire " dismantled and disconnected," and the salesman said he would. The owner, Wolford, was using the Frigidaire then, and a certain day

was fixed for its replacement with an ice box, so that the owner would have refrigeration at all times.

A liquid agent was used as a refrigerant, and it was necessary to drain this into the compressor and close that part, because the liquid produced a very disagreeable odor. Two of defendant's workmen came and drained the cooling agent into the compressor, and disconnected the Frigidaire into three parts, of which the compressor was one, so it could be removed. The compressor was sealed so as to prevent the escape of the odor or the liquid; and the parts were left upon the floor of the diner. The workmen then withdrew.

The owner did not "junk" the Frigidaire, in whatever sense he may have used that inexact and ambiguous slang word while describing his troubles with the utensil, but sold most of it to an ice cream merchant. The compressor was not sold readily, and he gave it to the plaintiff, whose occupation was that of a collector of garbage and junk. The plaintiff took it to his home and left it exposed to the sun and weather, on his premises; and a considerable time later attempted to separate it into its parts for the purpose of segregating the various metals of which it was composed. In this operation he removed the bolts from the "head" of the compressor, but the "head" still remained fixed. Thereupon he pounded it with a wrench. The "head" then came off suddenly and struck him in the face, causing unimportant injuries; and the liquid flew in his eyes, and in a large measure destroyed his sight. On the trial the jury gave him a verdict of $10,000.

As alleged in the complaint, and as established by the owner, Wolford, defendant's contract was to "dismantle and disconnect" the Frigidaire so that it could be removed and replaced by an ice box. There is no proof of any other undertaking. No repair nor any servicing was called for. There was no conversation about the work, except that already noted between the salesman and the owner. The work order added nothing.

The defendant did not manufacture, sell, install, nor recommend the Frigidaire. It neither owned nor controlled it. Neither did the defendant alter its structure or mechanism in any way, except to disconnect it; and the workmen left the parts on the floor of the diner in a condition as safe as it had been at any time during the eight and one-half years preceding.

The complaint alleges that the defendant knew it "was to be junked and discarded." The proof was otherwise, for it was not worthless, but it had been used by the owner up to that very time, as it had for the years preceding; and most of it was sold. The owner knew that the cooling agent was in the compressor, and

so testified. It did not and would not explode by the heat of the sun, and there is no proof of the reason why the " head " stuck or left the cylinder suddenly.

The plaintiff says that the defendant's workmen should have warned the owner; but the owner is not complaining. And were the workmen to inquire from the owner what he in fact intended to do with it, a short answer might have been given them. And if he had told the workmen of his intentions he could have changed his mind; he could do with the compressor as he pleased. If the owner was entitled to or needed information or instructions relative to the refrigerant doubtless he received it, or should have received it, from the manufacturer or the distributor who sold it to him; at any rate, he maintained it in safety for many years. He it was, of his own volition, who placed it in the hands of the plaintiff. The defendant and its servants had no relations whatever with the plaintiff. Even from the point of view of proximate cause, there was no relation between the defendant and the plaintiff, or between the conduct of defendant's agents and plaintiff's injury. In any aspect, the owner was an intervening cause.

This judgment was granted on the authority of *Parnell* v. *Holland Furnace Co.* (234 App. Div. 567; affd., 260 N. Y. 604). No other authority is cited here. I am unable to see any relation whatever between that case and the one under review. Here the persons involved are normals, transacting their business for profit. The *Parnell* case involved a child eight years of age, playing on a playground, known to be such, and where he had a right to play. The defendants owned and controlled and used as long as they could an old Ford truck and then abandoned it on the playground, where they left it for months. There, it might be argued, that the defendants maintained an attractive nuisance, and owed a direct duty to the children who played there. It might be argued that the defendants there were bound to recognize the attraction which such an object would furnish for children and the propensities of children to climb and to remove easily-removable parts. The principle applied there has no application here.

No case has been cited or found which is an authority for any principle on which this judgment may rest.

I vote to reverse the judgment and order and to dismiss the complaint.

Judgment and order affirmed, with costs.